IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

---

IN THE MATTER OF THE SEARCH OF

Subject Device 1 - Apple iPhone blue in color.

Subject Device 2 – Samsung Sm-S111DL(GP) IMEI: 352082508333129

Both devices are currently located at the at the King and Queen County Sheriff's Office 242 Allens Circle, King and Queen Court House, Virginia 23085

Case No. 3:22-SW-89



---

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Robert J. Puleo, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

I make this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—Apple iPhone blue in color, (**Subject Device 1**); and Samsung Sm-S111DL(GP) IMEI: 352082508333129, (**Subject Device 2**); more fully described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information, described in Attachment B, which is incorporated by reference.

1

## AGENT QUALIFICATIONS

1.       I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigation of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516, including violations of Title 21.  I have been a Special Agent with DEA since August 1999.  During my tenure with DEA, I have participated in complex international conspiracy investigations involving organizations responsible for the unlawful manufacturing, importation, transportation, and distribution of illegal drugs.  I have also investigated violent criminal offenses related to the activity of Drug Trafficking Organizations ("DTOs").   I have been involved in drug trafficking investigations of an international, national, and regional scope.

2.       I have attended classes and courses conducted by the DEA regarding the importation, transportation, and distribution of illegal drugs.  I am knowledgeable about state and federal laws.  I have participated in a number of drug trafficking, money laundering, and organized crime investigations that have resulted in the arrest of numerous members of several different international and domestic DTOs, and the seizure of currency, assets, and drugs.  I have directed and participated in many searches of residences and businesses of suspected drug traffickers for evidence of criminal activity.  I have also conducted and participated in the debriefing of many drug traffickers and money launderers, through which I have learned valuable information regarding techniques used by DTOs to distribute drugs in both domestic and international markets. Additionally, I have testified in numerous grand jury proceedings related to the investigation of individuals involved in drug trafficking and money laundering.  As a result of my training and

2

experience, I am familiar with the way in which DTOs illegally traffic, transport, and distribute drugs, and launder the proceeds derived from their drug distribution activity.

3.     Based on my experience as a law enforcement officer, I also know that those involved in drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and that they frequently employ coded language and slang terminology in an effort to maintain secrecy while engaging in such communications.

4.     Through my employment as a law enforcement officer, I have gained knowledge in the use of various investigative techniques, including the use of wire, oral, and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover operations, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

5.     Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and use of coded words to disguise conversations about their narcotics activities, especially when they are communicating by telephone.  I have had the opportunity to interview individuals involved in narcotics trafficking concerning the various methods by which they operate, to include their use of coded language and the avoidance of specific references to narcotics, and their practice of conducting most or all of their transactions in cash to avoid leaving a paper trail of their narcotics purchases, sales, and proceeds.  I have also learned that narcotics traffickers at the higher levels of

the trafficking hierarchy tend to avoid or minimize their possession of narcotics to avoid apprehension by law enforcement and that these high level narcotics traffickers tend to operate through intermediaries and "runners" to further minimize their own exposure.  In addition, I have learned the measures that narcotics traffickers use to avoid law enforcement surveillance and investigations, such as the development and use of aliases; the use of cellular telephones and other communication devices; the use of other individuals' names for telephones, pagers, assets, vehicles, houses, bank accounts, utilities, etc., in order to avoid the use of their own names being associated with these items and assets; and the use of counter-surveillance driving techniques to detect law enforcement surveillance and avoid being followed by law enforcement.

6.     The facts in this affidavit come from my personal observations, my training and experience and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C § 841(a)(1), namely distribution of and possession with intent to distribute controlled substances,  21 U.S.C § 846, conspiracy to distribute controlled substances have been committed, and violations of 18 U.S.C § 924(c), possession of a firearm during and in relation to a drug trafficking crime by George GIBSON and Daniel CHAVIS., and that a search of Subject Device 1 and Subject Device 2 described in Attachment A may contain evidence of these crimes, as described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.       The property to be searched are: (1) Apple iPhone blue in color,   **(hereinafter**
**referred to collectively as, "SUBJECT DEVICE 1")** and a (2) Samsung Sm-S111DL(GP) IMEI:
352082508333129 **(hereinafter referred to collectively as, "SUBJECT DEVICE 2")** currently
located at the King and Queen County Sheriff's Office 242 Allens Circle, King and Queen Court
House, Virginia 23085.   The applied-for warrant requests authorization to conduct forensic
examinations on SUBJECT DEVICE 1 and SUBJECT Device 2 for the purpose of identifying
electronically stored data particularly described in Attachment B.

## RELEVANT STATUTORY PROVISIONS

9.       21 U.S.C §§ 841(a)(1) – Possession with Intent to Distribute and Distribution of
Controlled Substances

10.      21 U.S.C. § 846 – Conspiracy to Distribute a Controlled Substance

11.      18 U.S.C. § 924(c) – Possession of a Firearm During and In Relation to a Drug
Trafficking Crime

## TECHNICAL TERMS

12.      Based on my training and experience, I use the following technical terms to convey

the following meanings:

      a.   **Wireless telephone**:  A wireless telephone (or mobile telephone, or cellular

         telephone) is a handheld wireless device used for voice and data

         communication through radio signals.  These telephones send signals through

networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

6

c.  **Portable media player**:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games.

d.  **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer connected to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

13.    Based on my training, experience and research, I know that SUBJECT DEVICE 1 and SUBJECT DEVICE 2 to have capabilities that allows them to: serve as a wireless telephone, digital camera, portable music/media player, connect to the internet, send and receive emails and/or send and receive text messages.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## PROBABLE CAUSE

14.    On March 16, 2022, a King and Queen Deputy responded to 2117 Mantua Road for a possible Emergency Protective Order violation by George GIBSON.  GIBSON was the subject of a protective order prohibiting him from being on the premises of 2117 Mantua Road.  Once at the residence, the responding Deputy observed a black GMC pickup parked with two males inside—GIBSON was the driver and Daniel CHAVIS was the passenger.  CHAVIS exited the vehicle and walked towards the residence.  The Deputy observed bullets in the armrest cut out. While speaking with GIBSON, GIBSON became irate and was asked to exit the vehicle.  A search of GIBSON revealed a 9mm bullet in his front pocket.  Inside the center console a plastic bag was located that contained a white crystal substance.  GIBSON told the Deputy it was "Crank for my own personal use."  The substance was consistent with methamphetamine.

15.    A green backpack was located on the passenger side rear seat. The front zipper pocket contained a plastic bag with a white crystal substance believed to be methamphetamine.

8

The main compartment of the bag was locked and a search warrant was obtained.  Inside the locked portion was a green leafy substance believed to be marijuana, digital scales, smoking devices, and packaging material.  There was a large plastic bag that contained what Deputies believed to be Psychedelic mushrooms, and a white crystal substance consistent with methamphetamine.  The suspected methamphetamine recovered from the backpack was approximately 100 grams.

16.    Behind the driver's seat was a red cloth bag which contained a large amount of green leafy substance believed to be marijuana.  Inside the front glove box glass smoking pipes with residue were found.  In the rear bed of the truck, black plastic rolling tool boxes were located and inside one was a large amount of a green leafy substance, also believed to be marijuana within a zippered pack and also a white plastic bag with more green leafy substance. Of the amount of marijuana recovered the amount recovered was consistent with distribution as it was suspected to be over 100 grams.

17.    A search warrant was obtained that covered the residence, outbuildings, and vehicles on the property.  The residence is owned by GIBSON's mother, but the mother lets GIBSON and his girlfriend live there.

18.    A gun and green leafy substance and a safe was located in a shed on the property. Inside the safe 2 additional guns, approximately 84 grams of a white crystal substance consistent with methamphetamine, and $13,594 were seized. There were 9 suspected marijuana plants on the property which did not identify to whom the plants were owned. GIBSON had $596.88 and CHAVIS had $506.00 seized from their persons.  GIBSON is known to go by the nickname "Bud." Packaging emblazoned with "Bud" were found in both GIBSON's vehicle as well as in the shed where additional narcotics were recovered.

9

19.     Inside a white Acura TL that was operated by CHAVIS, investigators located green leafy substance, white crystal substance consistent with methamphetamine, digital scales, packaging material and 50 pills believed to be Alprazolam.  The key to the vehicle was located in CHAVIS's pocket. GIBSON and CHAVIS were arrested.

20.     SUBJECT DEVICE 1 was recovered from GIBSON's person incident to his arrest and SUBJECT DEVICE 2 was recovered from CHAVIS's person incident to his arrest.  The amounts of narcotics recovered, digital scales, and packaging material are consistent with narcotics distribution.

21.     CHAVIS was later interviewed by law enforcement with his attorney present. After being *Mirandized*,  CHAVIS stated that he knew GIBSON had marijuana on him on March 26, 2022 and if CHAVIS needed marijuana and methamphetamine he would purchase those narcotics from GIBSON.  In addition,  several reliable confidential informants known to a narcotics investigator in King and Queen County explained that GIBSON is a known narcotics trafficker and that one of the informants purchased narcotics through an individual who stated he/she obtained the narcotics from GIBSON.   In fact, on March 11, 2022, one of these confidential informants called GIBSON in front of a King and Queen County narcotics investigator and one other law enforcement officer to purchase methamphetamine from GIBSON.  GIBSON stated that he currently did not have anything at the time, but might get additional supply in the next couple of days.  Finally, prior to March 26, 2022, one of the confidential informants stated that GIBSON often rode around with duffle bags and bags of narcotics but also kept distributable amounts of narcotics in the shed at 2117 Mantua Road.

10

22.     Based on my training and experience, your Affiant knows that cellular telephones like SUBJECT DEVICE 1 and SUBJECT DEVICE 2 are important to a criminal investigation of the distribution of illegal narcotics.  In particular, I know:

a.  that narcotic traffickers often use cellular telephones to communicate with sources of supply, drug transporters, facilitators, and customers in connection with their ongoing drug activities, including communication by live conversations, voice messages, text messages, emails, and similar communication methods all conducted via the cellular telephones that often have internet capabilities;

b.  that narcotic traffickers often use cellular telephones to maintain records, contact information, notes, ledgers, and other records relating to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code. That the aforementioned books, records, notes, ledgers, etc., are commonly maintained where narcotic traffickers have ready access to them, including but not limited to their cellular telephones;

c.  that narcotic traffickers commonly maintain names, addresses and telephone numbers in their cellular telephones for their associates in the narcotic trafficking organization, even if said items may be in code, and that these types of records are sometimes maintained in computers or other electronic data storage devices; and

d.  that many cellular telephones have extensive photography and video capabilities.  That many narcotic traffickers frequently use their cellular telephones to take, cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, their property, and their product, and that these traffickers usually maintain these photographs and/or videos, on their cellular telephones

23.     I have come to understand that individuals who are involved in illegal drug trafficking will often use their cell phones to communicate to set up transactions to include negotiating prices, type of illegal drug(s), and where to meet to conduct the sales of illegal drug(s). I have also come to understand that individuals will utilize cell phones to send photos of illegal drug(s) that are for sale.  I have also come to understand that individuals who are involved in illegal drug trafficking will often use multiple cell phones to undertake their illegal drug trafficking activities as described in this and preceding paragraphs.

11

24.     I have come to understand that individuals who possess firearms, will often use their cell phones to post videos/photos of themselves on various social media platforms such as Facebook and Snapchat.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25.     Based on my knowledge, training and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices.  This information can sometimes be recovered with forensics tools.

26.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of drug trafficking crimes as described herein, but also may provide forensic evidence that establishes how the Device was used, the purpose of its use, who used it and when.  There is probable cause to believe that this forensic electronic evidence might be found on SUBJECT DEVICE 1 and SUBJECT DEVICE 2 because:

  a.   Data on the storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

12

conclusions about how electronic devices were used, the purpose of their use, who used them and when.

d.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

28.  *Manner of execution.*  Because this warrant seeks only permission to examine SUBJECT DEVICE 1 and SUBJECT DEVICE 2 that is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.

13

Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## SPECIFICITY OF SEARCH WARRANT RETURN AND NOTICE
## REGARDING INITIATION OF FORENSIC EXAMINATION

29.     Consistent with the Court's current policy, the search warrant return will list the model and/or serial number of SUBJECT DEVICE 1 and SUBJECT DEVICE 2 and include a general description of any and all associated peripheral equipment that has been seized.

## CONCLUSION

30.     I have probable cause to believe that evidence exists on SUBJECT DEVICE 1 and SUBJECT DEVICE 2 that George GIBSON and Daniel CHAVIS have committed violations of 21 U.S.C §§ 841(a)(1), 21 U.S.C §§ 846 and 18 U.S.C. § 924(c).  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of SUBJECT DEVICE 1 and SUBJECT DEVICE 2 described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*Robert J. Puleo*

ROBERT PULEO
Digitally signed by ROBERT PULEO
Date: 2022.05.25 17:32:42 -04'00'

Robert J. Puleo
Special Agent, DEA

Subscribed and sworn to before me
on the ___26th___ day of ___May___, 2022.

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

14

## <u>ATTACHMENT A</u>

The property to be searched is: Apple iPhone blue in color (**Subject Device 1)** and Samsung Sm-

S111DL(GP) IMEI: 352082508333129 (**Subject Device 2)**. This warrant authorizes the forensic

examination of the Devices for the purpose of identifying the electronically stored information

described in Attachment B, which is incorporated by reference.

## **ATTACHMENT B**

1.        All records in the SUBJECT DEVICES, described in Attachment A, that relate to

violations of 21 U.S.C §§ 841(a)(1) distribution and possession with intent to distribute

controlled substances, 21 U.S.C §§ 846 possession of a controlled substance and 18 U.S.C. §

924(c) Possession of a Firearm when conducting a violent crime including:

      a.  Notes, ledgers, messages and similar records relating to the transportation, ordering, purchasing and distribution of controlled substances.

      b.  Address books, phone books, applications ("Apps") and similar records reflecting names, addresses, telephone numbers and other contact or identification data.

      c.  Digital photographs, videos or audio recordings of confederates, assets, or controlled substances, the spending of drug proceeds and specific locations connected to the user of the phone.

      d.  Digital photographs, videos or audio recordings of firearms

      e.  Stored communications, including text messages, MMS messages and voicemails.

      f.  Any subscriber or owner information for the cellular telephones.

      g.  Any cellular telephone records and telephone books or lists or receipts relating to the acquisition and purchase of cellular telephones or minutes purchased or applied to cellular telephones.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of devices or electronic storage (such as flash memory or other media that

can store data) and any photographic form.

1

2.      Evidence of user attribution showing who used or owned SUBJECT DEVICE 1 and SUBJECT DEVICE 2 at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.